IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ADAM MICHAEL HORSTMAN,

           Plaintiff,                 No. 3:15-cv-00203-PK

         v.

                               **FINDINGS AND RECOMMENDATION**

CITY OF HILLSBORO, et al.,

           Defendants.

---

**PAPAK, Magistrate Judge:**

    Plaintiff Adam Horstman brings this action against defendants David Bonn, Brian

Wilber, Ted Schrader (collectively, the "officer defendants"[1]), and City of Hillsboro (the "City").

Horstman asserts four claims: (1) false arrest in violation of the Fourth and Fourteenth

Amendments; (2) false arrest in violation of Oregon law; (3) malicious prosecution in violation

of the Fourth and Fourteenth Amendments; and (4) malicious prosecution in violation of Oregon

law. Horstman asserts his false arrest claims against all of the defendants and his malicious

---

[1] I recognize that defendants Bonn and Wilber are detectives and defendant Schrader is a
sergeant. I use the term "officer defendants" for brevity.

FINDINGS AND RECOMMENDATION  - PAGE 1

prosecution claims against defendants Bonn and the City only. Horstman brings his federal false

arrest claim and federal malicious prosecution claims under 42 U.S.C. § 1983.

Now before the court is Horstman's Motion for Partial Summary Judgment, ECF No. 46;

Defendants' Motion for Summary Judgment, ECF No. 50; and Defendants' Motion to Strike.

Horstman moves for summary judgment establishing Defendants' liability on his state and

federal false arrest claims; he leaves the issue of damages for trial. Defendants move for

summary judgment on all of Horstman's claims. For the reasons below, the parties' Cross-

Motions for Summary Judgment should be granted in part and denied in part, and Defendants'

Motion to Strike should be denied.

## BACKGROUND[2]

The officer defendants are members of the Hillsboro Police Department ("HPD"). This

case arises out of the officer defendants' July 4, 2014 arrest of Horstman in connection with four

separate pharmacy robberies. The first robbery occurred at a Rite Aid pharmacy in Hillsboro,

Oregon on May 18, 2014. Merrithew Decl. Ex. A, at 3, ECF No. 47-1. The robber escaped with

a large amount of prescription opiates. Merrithew Decl. Ex. A, at 3. Upon arriving at the

pharmacy, HPD Officers M. Herman and James Weed learned from witnesses that the suspect

entered the store, displayed a gun, and demanded OxyContin. Merrithew Decl. Ex. A, at 3.

Store surveillance video did not record the suspect brandishing a gun or provide a clear view of

his face. Merrithew Decl. Ex. A, at 3. The responding officers observed from the video that the

suspect had a "dark neatly manicured beard" and appeared to be wearing a black zip up jacket, a

black baseball cap, black pants, and black and white shoes. Merrithew Decl. Ex. A, at 3.

---

[2] Except where expressly indicated otherwise, I construe the evidentiary record according to the
legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

The responding officers interviewed two witnesses, employees Brij Patel and Jovencio Domingo. Merrithew Decl. Ex. A, at 4. Patel described the suspect as a white male adult approximately 5'11" to 6'1" tall, 200 pounds, with a beard, and having a muscular build. Merrithew Decl. Ex. A, at 4. Patel further stated that the suspect was wearing a black zip up hooded sweatshirt and black baseball cap. Merrithew Decl. Ex. A, at 4.

Domingo said the suspect was an adult white male with dark facial hair, standing around 5'11" with a muscular build. Merrithew Decl. Ex. A, at 4. He further stated that the suspect was wearing a baseball cap with an orange logo, a black zip up jacket, and dark jeans. Merrithew Decl. Ex. A, at 4.

The second robbery occurred on June 3, 2014 at an Albertsons pharmacy in Hillsboro, Oregon (the "first Albertsons robbery"). The robber again escaped with a large amount of prescription opiates. Responding HPD Officer Kelly Hickman interviewed witness Richard Glatt. Merrithew Decl. Ex. B, at 3, ECF No. 47-2. Glatt told Hickman that at approximately 9:00 p.m., a man entered the pharmacy and gave him a yellow sticky note that read, "gimme all of your Oxycodine and Ambien, and don't call the cops." Merrithew Decl. Ex. B, at 3. Glatt described the suspect as a white adult male who was about 5'8", weighed about 210 pounds, and wore black jeans, a black hooded sweatshirt, and black sunglasses. Merrithew Decl. Ex. B, at 3. Glatt did not report that the suspect had a beard.

The third robbery took place on June 18, 2014 at a different Albertsons pharmacy, this one in Beaverton, Oregon (the "second Albertsons robbery"). The robber again made off with a large amount of prescription opiates. Merrithew Decl. Ex. D, at 3. Beaverton Police responded to the scene of the crime and spoke with pharmacist Diana Youseff, who witnessed the crime. Merrithew Decl. Ex. D, at 3. Youseff described the suspect as a white male adult who appeared

to be in his mid-thirties. Merrithew Decl. Ex. D, at 3. The suspect was wearing black

sunglasses, a black hooded sweatshirt, black pants, a black baseball hat with a white logo on the

front, and black tennis shoes with white soles. Merrithew Decl. Ex. D, at 3.

      The final robbery took place on June 30, 2014 at a third, separate, Albertsons pharmacy

also in Hillsboro, Oregon (the "third Albertsons Robbery"). Consistent with the first three

robberies, the suspect stole a large amount of prescription opiates. HPD Officers Jincy Pace and

Mox Hermann responded to the call and spoke with several witnesses. Merrithew Decl. Ex. E, at

5, ECF No. 47-5. Pace first spoke with pharmacy employee Sherri Plasker, who described the

suspect as a white male who was 5'10" with a full, brownish-red beard. Merrithew Decl. Ex. E,

at 5. She further reported that the suspect was wearing black shoes with white soles, black pants,

a puffy black jacket with a hood, a black baseball cap, and black sunglasses. Merrithew Decl.

Ex. E, at 5. Plasker stated that the robber gave her a note demanding Oxycodone and Ambien.

Merrithew Decl. Ex. E, at 5. Plasker told Pace that she did not think she would be able to

subsequently identify the suspect. Merrithew Decl. Ex. T, at 7, ECF No.47-20.

      Pace also interviewed pharmacy employee Ryan Cleven, who described the suspect as a

white adult male who had a full beard and was dressed in black clothing. As with Plasker,

Cleven told Pace that he was unsure if he would recognize the suspect. Merrithew Decl. Ex. T,

at 7.

      Pace and Hermann reviewed the pharmacy's surveillance video. Pace noted that the

suspect appeared to be a male who was wearing dark clothing, a black jacket, black baseball cap,

and black sunglasses. Merrithew Decl. Ex. T, at 8. The suspect also appeared to have a full,

reddish-brown beard and was wearing black tennis shoes with white soles. Merrithew Decl. Ex.

T, at 8. The suspect was not wearing gloves. Merrithew Decl. Ex. T, at 8. Pace noted that the

video quality was poor, and the suspect's face appeared somewhat blurry. Merrithew Decl. Ex. T, at 8.

Unlike the previous robberies, the suspect left his demand note at the pharmacy. Plasker gave the note to Pace, who in turn placed it into evidence for fingerprinting. Merrithew Decl. Ex. E, at 5. Pace believed the note potentially contained fingerprints from the suspect, which she believed could help identify the robber. Merrithew Decl. Ex. T, at 5. However, no immediate action was taken to lift fingerprints from the note. Merrithew Decl. Ex. T, at 4-5. The note was eventually submitted for fingerprint analysis after Horstman's arrest, resulting in a positive identification of the actual perpetrator of all four robberies, a man named Shawn Simmons. Merrithew Decl. Ex. G, ECF No. 47-7.

At 10:30 p.m. on June 30, 2014, about two hours after the third Albertsons robbery, Horstman went to the Hillsboro Rite Aid that had been robbed on May 18 to fill a prescription he had just received from St. Vincent's Medical Center in Portland, Oregon. Merrithew Decl. Ex. U, at 8-10. Horstman did not attempt to conceal his identity while at the Rite Aid pharmacy. Merrithew Decl. Ex. ee, ECF No. 47-31. He waited in line patiently while the pharmacist was busy assisting other customers. Merrithew Decl. Ex. ee.

Domingo, the pharmacist who was robbed at gunpoint on May 18, filled Horstman's prescription. Merrithew Decl. Ex. F, at 3, Ex. ee, ECF Nos. 47-6, 47-31. Horstman signed his name on the pharmacy's electronic keypad to confirm his identity in order to receive his prescription. *See* Merrithew Decl. Ex. U, at 10, Ex. ff, ECF Nos. 47-21, 47-32. He left Rite Aid with his prescription at 10:46 p.m. Merrithew Decl. Ex. U, at 8-10.

Shortly thereafter, Rite Aid's assistant manager called 911 and reported that Horstman looked like the person who had previously robbed the pharmacy. Merrithew Decl. Ex. F, at 3,

Ex. hh, ECF Nos. 47-6, 47-34.  HPD Officer Jordan Schreiner responded to the report.
Merrithew Decl. Ex. F, at 3, Ex. hh.  Schreiner took statements from Domingo and another
employee, Brandee Mears.

Domingo told Schreiner that he was "approximately 90 percent sure" that Horstman was
the person who had committed the May 18 robbery.  Merrithew Decl. Ex. F, at 4.  Mears told
Schreiner that she was "80 percent" sure that Horstman was the person who had committed the
May 18 robbery.  Merrithew Decl. Ex. F, at 4.  Schreiner asked to see the actual prescription
order that Horstman brought to the store, and Domingo showed it to him.  Merrithew Decl. Ex.
F, at 4.  Schreiner could see from the prescription that Horstman had been issued a prescription
for Hydrocodone Acetaminophen that same day by Janice A. Tsuchida.  Merrithew Decl. Ex. U,
at 6-10, ECF No. 47-21.  Schreiner failed to follow up on that information.

The following morning, July 1, 2014, Officer Weed returned to the Rite Aid pharmacy
with a photo array that included Horstman's photo.  Merrithew Decl. Ex. kk, at 3 (#47-37).
Weed presented the photo array to both Mears and Domingo, neither of whom conclusively
identified Horstman as the robber.  Domingo was unable to make any identification.  Merrithew
Decl. Ex L, Ex. kk, at 3, ECF Nos. 47-12, 47-37.  Mears narrowed the photos down to two men
who "may" have been the suspect, one of whom was Horstman.  Merrithew Decl. Ex. K, ECF
No. 47-11.

By July 1, 2014, Defendants had concluded that all four of the robberies were committed
by the same man.  Merrithew Decl. Ex. V, at 8-10, Ex. Y, at 6, ECF Nos. 47-22, 47-25;
Edenhofer Decl. Ex. 1, at 23-24, ECF No. 53-1.  Defendants believed Horstman was the culprit.
Merrithew Decl. Ex. V, at 8-10, Ex. Y, at 6, ECF Nos. 47-22, 47-25; Edenhofer Decl. Ex. 1, at
23-24, ECF No. 53-1.

On July 2, 2014, defendant Wilber, an HPD detective, met with Ryan Cleven, a witness to the third Albertsons robbery. Merrithew Decl. Ex. J, at 3, ECF No. 47-10. Wilber showed Cleven a photo array containing Horstman's photo. Cleven was unable to conclusively identify Horstman or any other suspect. Merrithew Decl. Ex. J, at 3. Rather, Cleven was only able to narrow down the photos to three individuals, including Horstman. Merrithew Decl. Ex. J, at 3.

Wilber also met with Plasker on July 2, 2014. Edenhofer Decl. Ex. 3, at 5, ECF No. 53-3. Wilber was accompanied by defendant Bonn, who is also an HPD detective. Wilber showed Plasker the same photo array he had shown Cleven. Edenhofer Decl. Ex. 3, at 5, Ex. 7. Wilber presented the photos to Plasker twice. Merrithew Decl. Ex. X, at 9-12 , ECF No. 47-24. Upon the first viewing, Plasker noted that Horstman's photo looked like the robber. Merrithew Decl. Ex. X, at 11-12; Edenhofer Decl. Ex. 7. During the subsequent viewing, Wilber and Bonn reminded Plasker that she had suggested Horstman was the culprit. Merrithew Decl. Ex. X, at 11-12. Plasker then formally identified Horstman as the robber with "70 percent" certainty. Merrithew Decl. Ex. J, at 4, ECF No. 47-10.

On July 4, 2014, HPD officers arrested Horstman without a warrant on robbery and theft charges connected to all four robberies. Merrithew Decl. Ex. I, at 2, ECF No. 47-9. One of the arresting officers was defendant Schrader. Schrader had previously learned of Horstman's family through a child welfare investigation and a domestic dispute investigation, both of which involved only Horstman's wife, Christle Horstman, and her daughter. *See* Merrithew Decl. Ex. P, at 2-6, Ex. Q at 3, ECF Nos. 47-16, 47-17.

After his arrest, Horstman consented to a search of his home. Merrithew Decl. Ex. V, at 15, ECF No. 47-22. Defendants' search did not reveal any instrumentalities or fruits of any of the pharmacy robberies. Merrithew Decl. Ex. V, at 24. Defendants did find a dark jacket, hat,

and shoes. Edenhofer Decl. Ex. 1, at 30-31, ECF No. 53-1. They also discovered about 12

prescription pill bottles, but all of the pills were obtained through valid prescriptions. Merrithew

Decl. Ex. Y, at 9, ECF No. 47-25.

Wilber then interrogated Horstman for several hours, first at his home and then at the

HPD station. Horstman maintained his innocence throughout the interrogations. However,

during the interrogation at the police station, Wilber handed Horstman a photo from surveillance

video of the Rite Aid robbery and the following exchange ensued:

> Wilber: Okay. Does that look like the same person to you?
>
> Horstman: Yes, sir.
>
> Wilber: Is that you?
>
> Horstman: Yes, sir.

Merrithew Decl. Ex. jj, at 8, ECF No. 47-36. Horstman immediately realized his mistake and

spent the remainder of the interrogation insisting that he was not the person in the photograph.

Merrithew Decl. Ex. jj, at 10-44.

Bonn subsequently drafted a probable cause affidavit and presented it to Washington

County Deputy District Attorney Jeff Lesowski for the purpose of charging Horstman.

Merrithew Decl. Ex. I., Ex. V, at 17, ECF Nos. 47-9, 47-22; Lesowski Decl. ¶ 8, ECF No. 52.

Lesowski charged Horstman, and he was held in the Washington County Jail until July 9, 2014,

when the charges against him were dismissed.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). A

factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson*, 477 U.S. at 248. The substantive law governing a claim or

defense determines which facts are material. *See Moreland v. Las Vegas Metro. Police Dep't*,

159 F.3d 365, 369 (9th Cir. 1998). In ruling on a motion for summary judgment, the court must

draw all reasonable inferences in favor of the nonmoving party and may neither make credibility

determinations nor weigh evidence. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990). On cross-

motions for summary judgment, the court must consider each motion separately to determine

whether either party has met its burden with the facts construed in the light most favorable to the

other. *See* Fed. R. Civ. P. 56; *see also, e.g., Fair Hous. Council v. Riverside Two*, 249 F.3d

1132, 1136 (9th Cir. 2001).

## DISCUSSION

The parties present seven primary issues through their Cross-Motions for Summary

Judgment: (1) whether Defendants had probable cause to arrest Horstman, (2) whether

Defendants are entitled to qualified immunity, (3) whether there are genuine issues of material

fact concerning Horstman's municipal liability claims (known as *Monell* claims[3]) against the

City for false arrest and malicious prosecution, (4) whether the availability of a state court

remedy precludes Horstman's federal malicious prosecution claim, (5) whether there are genuine

issues of material fact concerning whether Lesowski exercised independent judgment in

charging Horstman, (6) whether there are genuine issues of material fact concerning whether

Defendants acted with malice in obtaining Horstman's prosecution, and (7) whether the Oregon

Tort Claims Act ("OCA") precludes Horstman's state law claims against the officer defendants.

---

[3] From *Monell v. Dep't of Soc. Serve. of City of New York*, 436 U.S. 658, 691 (1978).

I address each issue, in turn, below. However, as a preliminary matter, I address the Motion to Strike contained in Defendants' Response to Horstman's Motion for Partial Summary Judgment, ECF No. 67.

## I. Defendants' Motion to Strike Should Be Denied As Moot

Defendants move to strike HPD police reports attached as exhibits to the Declaration of Jesse Merrithew, ECF No. 47. The reports are not offered for the truth of the matters asserted therein. Rather, Horstman offers the reports to establish the information possessed by Defendants when they determined probable cause existed for Horstman's arrest. Consequently, the reports are not hearsay. See Fed. R. Evid. 801(c). Defendants' motion to strike the reports should therefore be denied.

Defendants also move to strike the Declaration of Daniel Weisberg, ECF No. 48, and the Declaration of Joseph Molinari, ECF No. 49. Defendants contend that the Weisberg Declaration is improper expert witness testimony. They contend that the Molinari Declaration is unsupported by a proper factual foundation and contains an improper legal conclusion. Both declarations relate to whether Defendants had probable cause to arrest Horstman. As explained below, I conclude that Defendants lacked probable cause for Horstman's arrest. In reaching this conclusion, I do not rely on the testimony provided by Weisberg or Molinari. Consequently, Defendants' motion to strike the Weisberg and Molinari Declarations should be denied as moot.

## II. Defendants Lacked Probable Cause to Arrest Horstman

Defendants' liability on Horstman's state and federal false arrest claims turns on whether they had probable cause to arrest Horstman. For the federal claim, 42 U.S.C. § 1983 provides a cause of action when a person is deprived of constitutional rights under the color of state law. It is undisputed that Defendants acted under the color of state law in arresting Horstman. Thus, the

controlling issue, at least for the individual defendants,[4] is whether Defendants violated

Horstman's Fourth Amendment right to be free from unreasonable seizures.  A warrantees arrest

is unreasonable under the Fourth Amendment when it is not supported by probable cause.  *See,*

*e.g.*, *Illinois v. Gates*, 462 U.S. 213, 230 (1983).

Similarly, the elements of Horstman's state law false arrest claim are: (1) Defendants

confined Horstman, (2) Defendants acted intentionally, (3) Horstman was aware of the

confinement, and (4) that the confinement was unlawful.  *Ross v. City of Eugene*, 950 P.2d 372,

375 (Or. App. 1997).  The first three elements of the tort are undisputed.  Therefore, the relevant

inquiry is whether Defendants' confinement of Horstman was unlawful.  Under Oregon law, as

under federal law, an arrest is unlawful when it is not supported by probable cause.  *See Gigler v.*

*City of Klamath Falls*, 537 P.2d 121, 125 (Or. App. 1975); *Gainer v. City of Troutdale*, No. 3:14-

cv-01346-SI, 2016 WL 107957, at *10 (D. Or. Jan. 8, 2016); *cf. Napier v. Sheridan*, 547 P.2d

1399, 1401 (Or. App. 1976) ("Want of probable cause, which must be shown in an action for

malicious prosecution, is not an issue in a false[]arrest action.  Nevertheless, it is fundamental

that the arrest must have been a [f]alse arrest, i.e., one made without legal authority. If the arrest

was lawful, then it was privileged.").  Thus, the question of Defendants' liability on both of

Horstman's false arrest claims turns on whether there was probable cause for Horstman's arrest.

## A.  Legal Standard

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy

information sufficient to lead a person of reasonable caution to believe that an offense has been

or is being committed by the person being arrested."  *United States v. Lopez*, 482 F.3d 1067,

1072 (9th Cir. 2007).  The probable cause inquiry takes into consideration the totality of the

circumstances existing at the time of the arrest.  *See id.*; *United States v. Ortiz-Hernandez*, 427

---

[4] I discuss the City's argument against *Monell* liability below.

FINDINGS AND RECOMMENDATION   - PAGE 11

F.3d 567, 574 (9th Cir. 2005). Consequently, arresting officers may not disregard exculpatory

facts when determining whether probable cause exists. *See Yousefian v. City of Glendale*, 779

F.3d 1010, 1014 (9th Cir. 2015) ("Certainly, an officer may not ignore exculpatory evidence that

would 'negate a finding of probable cause.'" (quoting *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th

Cir.2003)); *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005); *see also*

*Merriman v. Walton*, 856 F.2d 1333, 1335 (9th Cir. 1988) ("Under these circumstances, there is

no probable cause. A reasonable police officer would have made further inquiry before effecting

a warrantees arrest.").

 "Probable cause requires 'a probability or substantial chance of criminal activity.'"

*Merriman*, 856 F.2d at 1335 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

Although conclusive evidence of guilt is not necessary, "[m]ere suspicion, common rumor, or

even strong reason to suspect are not enough." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th

Cir.1984) (citing *Henry v. United States*, 361 U.S. 98, 101 (1959)). When the facts used in the

arresting officers' probable cause determination are undisputed, whether probable cause existed

for an arrest is "an essentially legal question" that should be determined by the district court at

earliest possible point in § 1983 false arrest litigation. *Peng v. Mei Chin Penghu*, 335 F.3d 970,

979 (9th Cir. 2003) (citation omitted) (internal quotation marks omitted).

## B. Analysis

 It is undisputed that Defendants based their probable cause determination on the

following four categories of facts: (1) photo identifications provided by pharmacy employees

who witnessed the robberies; (2) eyewitness identifications provided by Rite Aid employees who

were present when Horstman visited that store on June 30, 2014; (3) Horstman's general

resemblance to the robbery suspect seen on the pharmacies' surveillance videos; (4) Horstman's

wife's purported history of opiate abuse; (5) pill bottles and clothing found upon the post-arrest search of Horstman's home; (6) a post-arrest report and identification by Horstman's landlord indicating that Horstman was the suspect who had robbed the Rite Aid pharmacy; and (7) Horstman's inaccurate post-arrest admission that he was depicted in a still photo from surveillance footage of the Rite Aid robbery.

Horstman argues that all of the witness identifications were unreliable. He further argues that the photo array identification procedure used with Plasker was unconstitutionally suggestive. Additionally, Horstman argues that Defendants are not permitted to rely on post-arrest evidence in their probable cause determination. Horstman also argues that the arresting officers impermissibly ignored exculpatory evidence.

I conclude that Defendants lacked probable cause to arrest Horstman on July 4, 2014. The facts relied on by Defendants in their probable cause determination would not lead a reasonable person to believe that Horstman had committed robbery or theft.[5]

### 1. Photo Identifications

Defendants contend they relied heavily on the photo identifications provided by Plasker, Cleven, Domingo, and Mears in determining that they had probable cause to arrest Horstman. However, as explained above, it is undisputed that Cleven, Domingo, and Mears failed to conclusively identify Horstman in the photo arrays presented to them. Thus, the photo identifications provided by those witnesses—whether considered alone or with the other facts that entered into Defendants' probable cause determination— do not support a finding of probable cause.

---

[5] While "probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense," *Torres v. City of Los Angeles*, 548 F.3d 1197, 1207 (9th Cir. 2008), Defendants do not contend that there was probable cause to believe that Horstman had committed any offense other than robbery and theft in relation to the pharmacy robberies.

Plasker did affirmatively identify Horstman in the photo array she viewed. However, Plasker's identification did not generate probable cause for Horstman's arrest. "The Supreme Court has cautioned that '[a] major factor contributing to the high incidence of miscarriage of justice has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.'" *Grant v. City of Long Beach*, 315 F.3d 1081, 1086 (9th Cir. 2002) (alteration in original) (quoting *United States v. Wade*, 388 U.S. 218, 228 (1967)), *opinion amended on denial of reh'g*, 334 F.3d 795 (9th Cir. 2003). Whether witness identifications provide probable cause for an arrest involves two related inquiries: "(1) Did the officers employ an identification procedure so impermissibly suggestive as to give rise to a substantial likelihood of misidentification? And if so, (2) did the witnesses exhibit sufficient indicia of reliability to protect the integrity of their identifications?" *Id.* (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968); *United States v. Hanigan*, 681 F.2d 1127, 1133 (9th Cir. 1982)).

In this case, the identification provided by Plasker fails both parts of the dual inquiry. First, the photo identification procedure employed by Bonn and Wilber was impermissibly suggestive. As explained above, on July 2, 2014, Detectives Wilber and Bonn interviewed Plasker about the third Albertsons robbery. Edenhofer Decl. Ex. 3, at 5, ECF No. 53-3. The detectives presented Plasker with an array of eight photographs, one of which depicted Horstman. Edenhofer Decl. Ex. 3, at 5, Ex. 7, ECF Nos. 53-3, 53-7. The detectives presented the photos to Plasker twice. Merrithew Decl. Ex. X, at 9-12, ECF No. 47-24. On the first presentation, Plasker did not provide an official identification, but stated that the photo of Horstman "really look[ed] like" the suspect in the third Albertsons robbery. Merrithew Decl. Ex. X, at 11-12; Edenhofer Decl. Ex. 7. The detectives then removed from the array two photos

that Plasker said did not depict the suspect and showed her the remaining six photos again. Merrithew Decl. Ex. X, at 10. When the photo of Horstman came up during the second presentation, the detectives reminded Plasker that she kept saying that it looks similar to the robber. *See* Merrithew Decl. Ex. X, at 11-12. Plasker subsequently identified the photo of Horstman with 70 percent certainty. Edenhofer Decl. Ex. 7, at 1.

A photo identification procedure is impermissibly suggestive when a photograph of a single person is "in some way emphasized." *Grant*, 315 F.3d at 1087 (quoting *Simmons*, 390 U.S. at 383 (internal quotation marks omitted)). Detectives Wilber and Bonn emphasized Horstman's photo when they reminded Plasker that she had said it looked like the suspect. The detectives reminded Plasker "three or four different times," to which Plasker responded, "I was like, I said it that many times?" Merrithew Decl. Ex. X, at 11-12. The fact that the detectives were repeating Plasker's prior statements about the photos does not save the procedure from constitutional deficiency, because Plasker did not make an official identification until after the detectives' suggestive statements.

Although the photo identification procedure used with Plasker was impermissibly suggestive, it could still support a probable cause determination if Plasker's identification was sufficiently reliable. "Indicia of reliability include: 1) the opportunity to view the criminal at the time of the crime; 2) the degree of attention paid to the criminal; 3) the accuracy of the prior descriptions of the criminal; 4) the level of certainty demonstrated at the time of confrontation; and 5) . . . the length of time between the crime and the confrontation." *Grant*, 315 F.3d at 1087. Plasker had only a limited opportunity to view the robber. She stated that he was wearing black sunglasses, a baseball cap, and clothing that covered the rest of his body. Merrithew Decl. Ex.

E, at 5-6, ECF No. 47-5.  The majority of the robber's interaction was with Cleven.  Officer

Pace's account of the robbery is informative:

> Ms. Plasker was standing at the north end of the pharmacy counter when she
> noticed a "suspicious" looking man facing the Over-The-Counter (OTC) end-cap
> across from the pharmacy window. . . .  She surreptitiously requested store
> security walk by, but the man approached the pharmacy counter before anyone
> came to investigation [sic] Ms. Plasker's concerns.  She saw the man talking with
> Mr. Cleven and Ms. Plasker tried to determine if Mr. Cleven was okay.  The man
> walked toward her, along the half-wall, clearing [sic] trying to see if she was
> calling someone.  The man then left and Mr. Cleven told her that they had just
> been robbed.

Merrithew Decl. Ex. E, at 6.  Plasker's deposition testimony is consistent with Pace's report.  *See*

Merrithew Decl. Ex. X, at 4-5 (Plasker testifying that she was unable to get a good look at the

robber until he came over halfway down the half-wall).  Consequently, Plasker could give the

responding officer only a generic description of the suspect's sex, height, facial hair, and

clothing.  Merrithew Decl. Ex. E, at 6.  Her generic description was in no way unique to

Horstman.  *See* Merrithew Decl. Ex. E, at 6 (police report stating: "Ms. Plasker described the

man as approximately 5'10" with a reddish-brown[,] full beard").  Plasker told the responding

office that she "was not sure if she would be able to identify [the robber] if she saw him again."

Merrithew Decl. Ex. E, at 6.  The first and third reliability factors therefore strongly indicate that

Plasker's identification was not reliable.

Plasker stated that she looked at the suspect for about two minutes and tried to take a

mental note of what the suspect looked like during the robbery.  *See* Edenhofer Decl. Ex. 13, at

7, 10-11, ECF No. 53-13.  The second reliability factor therefore indicates some level of

reliability.

However, Plasker was far from certain of her identification of Horstman during the photo lineup. She stated that she was only 70 percent certain that he was the robber. Edenhofer Decl. Ex. 7, at 1. The fourth factor therefore weighs against a finding of reliability.

Finally, the detectives showed Plasker the photo array only two days after the third Albertsons robbery. *See* Edenhofer Decl. Ex. 3, at 25, ECF No. 53-3; Merrithew Decl. Ex. B, at 1, ECF No. 47-2. Therefore, the fifth factor indicates that Parker's identification was reliable.

Considering all of the reliability factors, I conclude that the circumstances surrounding the third Albertsons robbery render Plasker's identification inadequate to generate probable cause for Horstman's arrest.

### 2. Eyewitness Identifications

Defendants also relied on eyewitness identification provided by Rite Aid employees Mears and Domingo in determining that they had probable cause to arrest Horstman. As explained above, on June 30, 2014, Horstman visited the Rite Aid pharmacy that was previously robbed on May 18, 2014. Merrithew Decl. Ex. F, at 4, ECF No. 47-6. While Horstman was in the process of filling a prescription, Mears and Domingo identified him as the perpetrator of the previous robbery. Merrithew Decl. Ex. F, at 4; Edenhofer Decl. Ex. 1, at 11, 25-26, ECF No. 53-1. The pharmacy's assistant manager called HPD, and Office Schreiner responded. Merrithew Decl. Ex. F, at 3; Fraser Decl. Ex. E, at 6, ECF No. 62-5. Domingo told Officer Schreiner that he was 90 percent sure Horstman was the person who had previously robbed the pharmacy, and Mears similarly stated that he was 80 percent sure that Horstman was the perpetrator. Merrithew Decl. Ex. F, at 4; Edenhofer Decl. Ex. 1, at 12-13.[6]

---

[6] The parties dispute whether Mears contradicted that statement during her subsequent deposition testimony. Mears's deposition testimony is ambiguous, and I need not decide whether it was contradictory. Assuming, *arguendo*, that the deposition testimony was not contradictory, I nevertheless conclude that the identification given by Mears failed to provide probable cause for Horstman's arrest.

The identifications provided by Domingo and Mears did not generate probable cause for Horstman's arrest. When police officers rely on unsolicited eyewitness identifications (i.e. those provided in the absence of any sort of lineup procedure) in determining they have probable cause for an arrest, the identification must be sufficiently reliable. *See, e.g., Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009). Although witnesses like Domingo and Mears are presumed reliable, officers who receive a citizen report must nevertheless examine the basis of the witness's knowledge before concluding there is probable cause to make an arrest. *See Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991) (citation omitted). Thus, a citizen informant must still "furnish underlying facts sufficiently detailed to cause a reasonable person to believe that a crime had been committed and the named suspect was the perpetrator." *Id.* (quoting *People v. Ramey*, 545 P.2d 1333, 1336 (Cal. 1976)) (internal quotation marks omitted).

In this case, Defendants failed to garner from Domingo or Mears underlying facts that would cause a reasonable person to believe Horstman had committed robbery or theft. In fact, as explained above, neither Domingo nor Mears were able to conclusively identify Horstman as the robber in a photo lineup conducted the following day. Domingo was unable to identify the robber from the eight men in the photo array he viewed. Merrithew Decl. Ex. L, ECF No. 47-12. Mears was able to say only that two of the eight men may have been the robber. Merrithew Decl. Ex. K, ECF No. 47-11.

Moreover, even assuming, *arguendo*, that the identifications provided by Domingo and Mears did generate probable cause for Horstman's arrest, Defendants learned of additional information that dispelled that probable cause before they arrested Horstman. *See United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) ("In some instances there may initially be probable cause justifying an arrest, but additional information obtained at the scene may indicate

that there is less than a fair probability that the defendant has committed or is committing a crime. In such cases, execution of the arrest or continuation of the arrest is illegal."); *Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015) ("Certainly, an officer may not ignore exculpatory evidence that would 'negate a finding of probable cause.'" (quoting *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir.2003)); *see also Merriman v. Walton*, 856 F.2d 1333, 1335 (9th Cir. 1988) ("Under these circumstances, there is no probable cause. A reasonable police officer would have made further inquiry before effecting a warrantees arrest.").

The most important piece of dispelling information was obtained during the June 30 interview of Domingo and Mears, when Officer Schreiner requested and received the prescription order that Horstman had filled at Rite Aid that day. Merrithew Decl. Ex. F, at 4, Ex. U, at 6-10, ECF Nos. 47-6, 47-21. The prescription was issued by Janice A. Tsuchida earlier that same day. Merrithew Decl. Ex. U, at 6-10. Had Defendants acted on that important piece of information, they would have discovered that Horstman had received treatment at St. Vincent's hospital from 6:00 p.m. to 9:30 p.m. on June 30, 2014—making it impossible for him to have committed the third Albertsons robbery. *See* Merrithew Decl. Ex. R, at 4, ECF No. 47-18; Merrithew Decl. Ex. E, at 2,4, ECF No. 47-5.

Also on June 30, 2014, Officer Schreiner learned from Rite Aid employees and surveillance videos that Horstman arrived at the pharmacy just two hours after the third Albertsons robbery, in which the robber made off with 417 thirty-milligram pills of Oxycodone, 200 fifteen-milligram pills of Oxycodone, and 216 ten-milligram pills of Ambien. *See* Merrithew Decl. Ex. E, at 7, Ex. ff, ECF Nos. 47-5, 47-32. In contrast to the robber who had just made off with a large amount of prescription opiates, Horstman presented the Rite Aid pharmacy with a lawful prescription for a mere 15 pills. *See* Merrithew Decl. Ex. U, at 8, ECF No. 47-21.

Additionally, Horstman did not act suspicious during his visit to the Rite Aid that Defendants believed he had previously robbed. *See* Merrithew Decl. Ex. ff, ECF No. 47-32. When it was his turn to be served at the pharmacy, Horstman walked directly to the pharmacist and calmly handed over his lawful prescription. *See* Merrithew Decl. Ex. U, at 8, Ex. ff. Horstman then waited patiently at the pharmacy for about 15 minutes while his prescription was being filled. *See* Merrithew Decl. Ex. F, at 4-5, Ex. ff. Horstman did not attempt to conceal his identity at any point. *See* Merrithew Decl. Ex. ff. He voluntarily identified himself by presenting his prescription and signing the pharmacy's electronic keypad. *See* Merrithew Decl. Ex. U, at 10, Ex. ff.

In light of these facts, after June 30, 2014, Defendants' theory that Horstman was responsible for the series of pharmacy robberies was no longer probable. *See Lopez*, 482 F.3d at 1073 (new evidence may dispel previously existing probable cause). At the very least, the inconsistencies in Defendants' theory, and their inability to obtain a reliable positive identification, imposed a duty on them to further investigate the robberies before determining that they had probable cause to arrest Horstman. *See Merriman*, 856 F.2d at 1335. Had Defendants further investigated the robberies, they would have discovered Horstman's alibi for the third Albertsons robbery. They would have also discovered that the demand note recovered from that robbery—which they had in evidence at that time—contained fingerprints belonging to Simmons, not Horstman. Merrithew Decl. Ex. G, ECF No. 47-7.[7] Consequently, the

---

[7] Defendants attempt to justify their failure to submit the prints for testing by arguing that they did not have time to test for prints before Horstman's arrest. However, the undisputed evidence shows that it took only one day to pull prints from the note. *See* Merrithew Decl. Ex. S, at 20, ECF No. 47-19 (demand note sent to the Oregon State Police crime lab for forensic examination on July 17, 2014, and results received by email on July 18, 2014). Horstman was arrested on July 4, 2014. That was four days after the demand note was logged into evidence for fingerprint testing and Defendants had obtained facts from the Rite Aid employees that cast serious doubt on their theory that Horstman was responsible for the four pharmacy robberies. *See* Merrithew Decl. Ex. E, at 5, Ex. I, at 2, ECF Nos. 47-20, 47-9.

FINDINGS AND RECOMMENDATION   - PAGE 20

identifications provided by Domingo and Mears did not generate probable cause for Horstman's arrest.

### 3.  Horstman's Resemblance to the Robbery Suspect in the Surveillance Videos

Defendants additionally relied on Horstman's resemblance to images of the robbery suspect captured by pharmacy surveillance cameras. I have reviewed the surveillance video from the Rite Aid robbery and find the video quality to be poor at best. *See* Merrithew Decl. Ex. ee, ECF No. 47-31. The responding officer noted in his report that the video did not capture a clear image of the robber's face. Merrithew Decl. Ex. A, at 3, ECF No. 47-1. The officers that responded to the first and third Albertsons robberies similarly noted that the poor quality of the surveillance videos that captured those robberies, failing to show the suspect in detail. *See* Merrithew Decl. Ex. C, at 3, ECF No. 47-3 (*"It should be noted that the quality of the video is poor and doesn't show great detail or facial features."* (emphasis in original)); Merrithew Decl. Ex. T, at 10, ECF No. 47-20 (acknowledging that the video from the third Albertsons robbery was blurry and did not adequately depict the robber's face).

The parties have not submitted the surveillance video from the second Albertsons robbery, or evidence of the quality of that video. However, it is undisputed that the robber wore dark sunglasses, a baseball cap, and a hood during the commission of that robbery. Merrithew Decl. Ex. D, at 3, ECF No. 47-4. Therefore, the surveillance video from the second Albertsons robbery also would not adequately depict the robber.

At best, the surveillance footage provided a general description of the suspect—a light skinned, stocky male of average height with a beard. Although Horstman fit that general description, under the law of the Ninth Circuit "mere resemblance to a general description is not enough to establish probable cause." *Grant*, 315 F.3d at 1088 (citing *Washington v. Lambert*, 98

F.3d 1181, 1190–91 (9th Cir.1996)).  Consequently, Horstman's resemblance to surveillance footage of the robbery suspect did not provide probable cause for Horstman's arrest.

### 4. Horstman's Wife's Purported Opiate Abuse

Defendants also relied on Christle Horstman's purported history of prescription opiate abuse in making their probable cause determination.  Defendants' belief that Christle Horstman abused opiates was based on previous child welfare and domestic dispute investigations involving Christle Horstman and her daughter.  Neither of those investigations provided probable cause to arrest Horstman.

The child welfare investigation did not concern Horstman.  It occurred eight years before his arrest, and before his marriage to Christle Horstman.  Merrithew Decl. Ex. P, at 2-3, ECF No. 47-16.  The investigation arose during Christle Horstman's divorce from her previous husband.  Merrithew Decl. Ex. P.  Schrader had conducted a home visit with a Department of Human Services investigator and noted that "Christle did not appear to be under the influence of an intoxicant and was aware of the current concerns."  Merrithew Decl. Ex. P, at 2, 6.  Schrader further learned that Christle Horstman had lawful prescriptions for Vicodin to treat chronic joint pain.  Merrithew Decl. Ex. P, at 6.  Although Christle Horstman admitted to sometimes taking her medications when she did not think she needed to, Schrader ultimately determined that there "was a lack of evidence that Christle's prescription medication use/abuse caused a neglectful or unsafe living environment for her children."  Merrithew Decl. Ex. P, at 6.  He nevertheless formed the belief that Christle Horstman was addicted to and abused oxycodone, and he shared that belief with the other officers who were investigating Horstman as a suspect in the pharmacy robberies.  Edenhofer Decl. Ex. 2, at 8, ECF No. 53-2.  Because the child welfare investigation

was eight years before Horstman's arrest and had nothing to do with Horstman, it did not

provide probable cause for his arrest.

On March 8, 2014, Horstman called the Washington County Sherriff's Office to report a

dispute between Christle Horstman and her daughter. Merrithew Decl. Ex. Q at 3, ECF No. 47-

17. Christle Horstman had found a bag of what she believed to be drugs in the daughter's room.

Merrithew Decl. Ex. Q at 3. The only mention of drug use by either Christle Horstman or

Horstman in the resulting report is as follows: "the daughter told me as her mother continued to

accuse [her of] using, she returned the favor and began accusing her and Adam [Horstman] of

abusing pills. I asked her if she had any evidence of this and she said no." Merrithew Decl. Ex.

Q at 3-4. Because the domestic dispute investigation had little to do with drug use by Christle

Horstman or Horstman, it was insufficient to provide probable cause for Horstman's arrest.

### 5. Post-Arrest Facts

Finally, I reject Defendants' attempt to rely on post-arrest facts to support their probable

cause determination. Horstman is correct that evidence gathered subsequent to an arrest is

irrelevant to the question of probable cause for the arrest. Probable cause must be determined

based on facts known to the arresting officer *at the moment of arrest*. *See, e.g.*, *Beck v. State of

Ohio*, 379 U.S. 89, 91 (1964) (citations omitted). Consequently, in determining whether

Defendants had probable cause to arrest Horstman, I do not consider the pill bottles and clothing

found during the search of Horstman's home, the report and identification by Horstman's

landlord, or Horstman's erroneous admission that he was depicted in a still photo from

surveillance footage of the Rite Aid robbery.

In sum, none of the facts Defendants relied on in determining that Horstman was

responsible for the pharmacy robberies, whether considered individually or together, provided

probable cause for his arrest.  Considering the totality of the facts, I conclude that Defendants lacked probable cause for Horstman's arrest.

**III. The Officer Defendants Are Not Entitled To Qualified Immunity**

The officer defendants argue that, even if there was no probable cause for Horstman's arrest, they are nevertheless entitled to summary judgment on Horstman's § 1983 claims for false arrest and malicious prosecution.  "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'"  *City & Cty. of San Francisco. v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1774 (2015) (citation omitted).  As explained below, Horstman's federal malicious prosecution claim, like his federal false arrest claim, turns on whether Defendants' arrest of Horstman violated his Fourth Amendment rights.  Therefore, the pertinent question for determining qualified immunity is whether the officer defendants' conduct violated Horstman's clearly established constitutional right to be free from unreasonable seizures.

When a police officer asserts qualified immunity, the court must apply a two-part analysis.  *Grant*, 315 F.3d at 1089.  "The first question is whether the facts, when taken in the light most favorable to [the plaintiff], show that the officers' conduct violated a constitutional right."  *Id.*  My conclusion that the officer defendants arrested Horstman without probable cause satisfies this initial inquiry.  *See, e.g.*, *id.*

"The second question is whether the constitutional right at issue is 'clearly established.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *receded from on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (courts are not required to consider the two questions for qualified immunity in sequence)).

The "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "The plaintiff bears the burden of showing that the right at issue was clearly established under this second prong." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002) (citation omitted). Thus, to withstand Defendants' Motion for Summary Judgment on his federal claims, Horstman must show that a reasonable officer would not have arrested him based on the witness identifications, his general resemblance to the robbery suspect; his wife's purported history of opiate abuse; and the evidence gathered after his arrest.

Horstman has carried his burden of showing that the officer defendants violated his clearly established right to be free from unreasonable seizures. As explained above, Plasker was the only witness who conclusively identified Horstman in a photo lineup. However, the lineup procedure used with Plasker was impermissibly suggestive because it emphasized Horstman's photo. Furthermore, Plasker's identification lacked sufficient indicia of reliability. It is clearly established that making an arrest based on a suggestive photo lineup procedure that emphasizes a suspect's photo and leads to an unreliable identification violates the suspect's constitutional rights. *See, e.g., Simmons v. United States*, 390 U.S. 377, 384 (1968); *United States v. Wade*, 388 U.S. 218, 228 (1967); *Grant*, 315 F.3d at 1086; *United States v. Hanigan*, 681 F.2d 1127, 1133 (9th Cir. 1982).

Nor was it reasonable for the officer defendants to rely on the identifications provided by Domingo and Mears in determining they had probable cause to arrest Horstman. It is clearly established that police officers must examine the basis of an eyewitness's knowledge before concluding there is probable cause to make an arrest. *See Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991). The eyewitness must "furnish underlying facts sufficiently detailed

to cause a reasonable person to believe that a crime had been committed and the named suspect was the perpetrator." *Id.* (citation omitted) (internal quotation marks omitted). As explained above, the officer defendants failed to gather such underlying facts from Domingo and Mears. The information the officer defendants obtained from Domingo and Mears instead cast serious doubt on their theory that Horstman had committed the four pharmacy robberies. In light of that information, Defendants had a clearly established obligation to investigate further before arresting Horstman. *See Merriman*, 856 F.2d at 1335 ("A reasonable police officer would have made further inquiry before effecting a warrantees arrest").

As further explained above, the officer defendants determined that Horstman resembled the robbery suspect based on surveillance footage from the robberies. However, that footage failed to depict the robber in any detail. It is clearly established that an officer may not make an arrest based on mere resemblance to a general description. *Grant*, 315 F.3d at 1088 (citing *Washington v. Lambert*, 98 F.3d 1181, 1190–91 (9th Cir.1996)).

Additionally, for the reasons provided above, the officer defendants' belief that Horstman's wife abused opiates did not provide probable cause to arrest Horstman. The evidence underlying that belief was stale and, to a large extent, irrelevant. Thus, it was not sufficient to create a probability that Horstman—or his wife, for that matter—had committed a crime. The insufficiency of such evidence is clearly established. *See, e.g., Merriman*, 856 F.2d at 1335 ("Probable cause requires 'a probability or substantial chance of criminal activity.'" (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

Finally, as explained above, it is clearly established that an officer may not base probable cause for an arrest on evidence gathered after the arrest. That principle derives from the rule that

probable cause must be determined on facts known to the arresting officers *at the moment of arrest. See, e.g., Beck v. State of Ohio*, 379 U.S. 89, 91 (1964) (citations omitted).

In sum, a reasonable officer would not have arrested Horstman based on the facts known to the officer defendants when they arrested Horstman. I am mindful that probable cause must be determined on the totality of the circumstances. I conclude that under these facts, the Fourth Amendment right to be arrested based on probable cause was clearly established, and that a reasonable officer would not have believed there was probable cause to arrest Horstman. Consequently, the officer defendants are not entitled to qualified immunity.

## IV. The City Is Entitled to Summary Judgment on the *Monell* Claims

Horstman asserts his federal claims for false arrest and malicious prosecution against the City as well as the officer defendants. Under *Monell*, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Rather, "municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (citation omitted) (internal quotation marks omitted). To recover from the City, Horstman must therefore show that his constitutional injury was inflicted pursuant to a City policy, regulation, custom, or usage. *See Monell*, 436 U.S. at 690–91.

The City argues that it is entitled to summary judgment on Horstman's *Monell* claims because, even assuming that Horstman was arrested without probable cause, a reasonable trier of fact could not find that the unlawful arrest was caused by a City policy. I agree.

Horstman argues that a reasonable trier of fact could find that the City had a policy of not adequately training its police officers on eyewitness identification procedures. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). However, a municipality's § 1983 liability "is at its most tenuous where a claim turns on a failure to train." *Id.* To succeed on a *Monell* claim based on failure to train, the failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (alteration in original) (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (citation omitted) (internal quotation marks omitted). Consequently, a plaintiff proceeding on a failure to train theory must establish that the municipality was on notice that an omission in its training program caused municipal employees to violate citizens' constitutional rights. *Id.*, 563 U.S. at 61-62 (citation omitted). Ordinarily, that showing requires proof of a "pattern of similar constitutional violations by untrained employees." *Id.*, 563 U.S. at 62 (2011) (citation omitted).

However, "in a narrow range of circumstances," a plaintiff can establish deliberate indifference without proving a pattern of similar violations. *Id.*, 563 U.S. at 63 (citation omitted) (internal quotation marks omitted). The United States Supreme Court first recognized the theory of "single-incident" failure to train liability in *Canton v. Harris*, 489 U.S. 378 (1989). As the Court recently explained:

> The [*Canton*] Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. . . . Given the known frequency with which police attempt to

arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights.

*Connick*, 563 U.S. at 63 (citations omitted).

In *Connick,* the Supreme Court rejected a failure to train claim against a county

prosecutor's office based on a single *Brady* violation by one of its prosecuting attorneys. *See*

*Connick*, 563 U.S. at 63-72. The Court held that the claim failed as a matter of law because the

plaintiff failed to prove that the district attorney was on notice of, and therefore deliberately

indifferent to, a need to provide *Brady* training. *Id.*, 563 U.S. at 59. The Court found that

although the district attorney's office failed to provide *Brady* training, its prosecuting attorneys

had independent knowledge of *Brady* principles. *Id.*, 563 U.S. at 57, 64-65. The Court then

determined that the lack of nuanced training alleged by the plaintiff was not actionable under §

1983.

> A second significant difference between this case and the example in *Canton* is the nuance of the allegedly necessary training. The *Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force. But it is undisputed here that the prosecutors in Connick's office were familiar with the general *Brady* rule. Thompson's complaint therefore cannot rely on the utter lack of an ability to cope with constitutional situations that underlies the *Canton* hypothetical, but rather must assert that prosecutors were not trained about particular *Brady* evidence or the specific scenario related to the violation in his case. That sort of nuance simply cannot support an inference of deliberate indifference here.

*Id.*, 563 U.S. at 67. According to the *Connick* Court, "showing merely that additional training

would have been helpful in making difficult decisions does not establish municipal liability. *Id.*,

563 U.S. at 69.

Horstman's *Monell* claims fail as a matter of law. As stated above, those claims are

based on the City's purported policy of not adequately training its police officers on eyewitness

identification procedures, which allegedly caused Horstman's unlawful arrest. As in *Connick*, Horstman does not rely on a pattern of similar Fourth Amendment violations to establish his *Monell* claims. Rather, Horstman relies a single-incident theory of liability. In support, Horstman cites deposition testimony from HPD Lieutenant Craig Allen, which suggests that HPD officers are not formally trained on the following subjects: (1) the most recent Oregon Supreme Court cases on eyewitness identification; (2) probable cause affidavits; (3) photo identification lineups; and (4) the reliability of witness statements and identifications. *See* Fraser Decl. Ex. F, at 7-11, ECF No.62-6.

None of the evidence presented by Horstman would permit a reasonable trier of fact to find that the City's failure to train its police officers amounted to a deliberate indifference to citizens' rights. At the outset, I note that the line of question presented to Lieutenant Allen was specifically and repeatedly limited to the provision of *formal* training on the above-mentioned subjects. *See* Fraser Decl. Ex. F, at 8. The *Connick* Court specifically rejected the argument that a lack of formal training is sufficient to establish § 1983 liability for failure to train.

> Thompson suggests that the absence of any *formal* training sessions about *Brady* is equivalent to the complete absence of legal training that the Court imagined in *Canton*. But failure-to-train liability is concerned with the substance of the training, not the particular instructional format. [Section 1983] does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States.

*Connick*, 563 U.S. at 68. Additionally, it is undisputed that HPD requires its officers to undergo a Field Training Evaluation Program on administering photo identification lineups and drafting probable cause affidavits. Edenhofer Decl. Ex. 3, at 25, Ex. 14, at 2-3, ECF Nos. 53-3, 53-14. It is also undisputed that HPD detectives, such as defendants Bonn and Wilber, receive additional, supplemental training on eyewitness identifications and photo array procedures through the detective academy and through less formal discussions and briefings. Edenhofer

FINDINGS AND RECOMMENDATION   - PAGE 30

Decl. Ex. 1, at 19, Ex. 3, at 33-34, Ex. 14, at 3, ECF Nos. 53-1, 53-3, 53-14); *see also Connick*, 563 U.S. at 65 (approving informal training).

Thus, similar to the prosecutors in *Connick*, HPD officers have a working knowledge of witness identification procedures and probable cause affidavits. Because the officers acquire that knowledge through HPD training, Horstman's failure to train claim is even weaker than the failure to train claim in *Connick*—where it was undisputed that the prosecutor's office did not provide *any* training on *Brady*. *Connick*, 563 U.S. at 58. Horstman essentially argues that the City was required to provide additional and different training to its officers. The *Connick* court expressly rejected that argument. *Id.*, 563 U.S. at 67, 69.

I conclude that this case does not fall within the narrow single-incident liability exception recognized by *Canton*. Consequently, to succeed on his *Monell* claims at trial, Horstman would have to prove a pattern of similar unlawful arrests by the HPD. *See Connick*, 563 U.S. at 71-72 . Horstman has not offered any evidence of such a pattern. The City is therefore entitled to summary judgment on Horstman's federal claims for false arrest and malicious prosecution claims.

## V. Availability of a State Court Remedy

Defendants Bonn and the City argue that they are entitled to summary judgment on Horstman's federal malicious prosecution because the state judicial system is capable of remedying the wrongs Horstman allegedly suffered at the hands of Defendants. I disagree.

It is true that "malicious prosecution generally does not constitute a deprivation of liberty without due process of law and is not a federal constitutional tort if process is available within the state judicial systems to remedy such wrongs." *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985). However, there is an important distinction between § 1983 claims alleging violation

of procedural due process rights secured by the Fourteenth Amendment and those alleging a

violation of rights secured by the Bill of Rights. *See generally Robins v. Harum*, 773 F.2d 1004,

1009 (9th Cir. 1985). The Ninth Circuit has held that the existence of a state court remedy does

not bar a § 1983 claim based on a Fourth Amendment violation. *See id.* Horstman's federal

malicious prosecution claim is based on violations of his Fourth, as well as Fourteenth,

Amendment rights. *See* Am. Compl. 10, ECF No. 45. As this court has previously recognized, a

"malicious prosecution claim may arise from a violation of the Fourth Amendment." *Child v.*

*City of Portland*, 547 F. Supp. 2d 1161, 1166 (D. Or. 2008) (citing *Awabdy v. City of Adelanto*,

368 F.3d 1062, 1069 (9th Cir. 2004)). Consequently, the availability of a state court remedy

does not bar Horstman's federal malicious prosecution claim.

## VI. The Presumption of Prosecutorial Independence Does Not Apply Here

Defendants Bonn and the City also argue that Deputy District Attorney Lesowski's

decision to charge Horstman broke the chain of causation between their unlawful arrest of

Horstman and any damages he may have suffered as a result of malicious prosecution. I am

unpersuaded.

"A prosecutor's independent judgment may break the chain of causation between the

unconstitutional actions of other officials and the harm suffered by a constitutional tort plaintiff."

*Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008). For claims under Fourth

Amendment, courts within the Ninth Circuit use a rebuttable presumption to address this

causation issue. *See, e.g.*, *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981), *overruled on*

*other grounds by Beck*, 527 F.3d at 865. "Filing of a criminal complaint immunizes

investigating officers . . . from damages suffered thereafter because it is presumed that the

prosecutor filing the complaint exercised independent judgment in determining that probable

cause for an accused's arrest exists at that time." *Smiddy*, 665 F.2d at 266. However, a constitutional tort plaintiff can rebut the presumption of prosecutorial independence by showing, *inter alia,* that the police knowingly provided the prosecutor misleading information, concealed exculpatory evidence, or acted maliciously or with reckless disregard of the plaintiff's rights. *See Beck*, 527 F.3d at 862; *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004).

Here, Horstman has presented sufficient evidence to permit a reasonable trier of fact to find that Bonn's conduct compromised Lesowski's independent judgment. That evidence suggests that Bonn knowingly provided Lesowski misinformation about the description of the suspect from the various pharmacy robberies. Bonn testified at deposition that he relied on the reports of the responding officers in drafting the probable cause affidavit he submitted to Lesowski for the purposes of charging Horstman. *See* Fraser Decl. Ex. A, at 12-14, 17, ECF No. 62-1; *see also* Lesowski Decl. ¶ 8, ECF No. 52 (Lesowski states that he reviewed the probable cause affidavit prepared by Bonn before charging Horstman). However, Bonn's description of the suspect in the probable cause affidavit differed from the police reports' descriptions of the various robberies. Bonn provided a consistent description, which matched Horstman's description, of the suspect from all of the robberies, but the underlying reports themselves were inconsistent.

For example, Bonn described the suspect from the Rite Aid robbery as a male "with a thick dark colored beard." Merrithew Decl. Ex. I, at 2, ECF No. 47-9. However, the report Bonn relied on describes the suspect as a male with a "dark neatly manicured beard." Merrithew Decl. Ex. A, at 3, ECF No. 47-1. Bonn described the suspect from the first Albertsons robbery as male with a "dark colored beard." Merrithew Decl. Ex. I, at 2, ECF No. 47-9. Conversely, the report on which Bonn relied does not mention a beard at all; Bonn simply added that fact.

FINDINGS AND RECOMMENDATION   -  PAGE 33

*See* Merrithew Decl. Ex. B., at 3, ECF No. 47-2. Bonn described the suspect from the third

Albertsons robbery as a man with a "dark beard." Merrithew Decl. Ex. I, at 2, ECF No. 47-9.

But the reports on which Bonn relied described suspect's beard as red, brownish-red, and blonde,

but nowhere do they describe the suspect's beard as "dark." Merrithew Decl. Ex. E, at 5-7, ECF

No. 47-5; Fraser Decl. Ex. A, at 17-19, ECF No. 62-1.

      Horstman has also presented evidence that Bonn misrepresented statements Horstman

made during his interrogation, making it sound as though he admitted to being at the scene of the

Rite Aid robbery when it occurred. Bonn's entire description of the interrogation in his probable

cause affidavit reads as follows:

> Horstman was interviewed about the robberies. He looked at printouts of security
> camera footage and admitted to being the same person depicted in the first
> incident on 5/18/2014 stating "that's me." He also admitted to being [the] person
> depicted at Rite Aid on 6/30/2014 when he filled the prescription. He did not
> admit to committing any robberies.

Merrithew Decl. Ex. I, at 3, ECF No. 47-9. Bonn omitted that when Horstman examined the

photo from the Rite Aid robbery more closely, he realized he was mistaken and repeatedly

insisted that he was not shown in the photo. Merrithew Decl. Ex. jj, at 4-11, ECF No. 47-36.

      A reasonable trier of fact could infer from this evidence that Bonn's conduct

compromised Lesowski's independent judgment. Consequently, the presumption of

prosecutorial independence does not entitle Bonn or the City to summary judgment on

Horstman's state and federal malicious prosecution claims.

**VII. Malice**

      Defendants Bonn and the City further argue that they are entitled to summary judgment

on Horstman's state and federal malicious prosecution claims because Horstman has failed to

present sufficient evidence of malice. I disagree.

FINDINGS AND RECOMMENDATION   - PAGE 34

Bonn and the City are correct that malice is a necessary element of both the state and federal malicious prosecution claims. *See Awabdy*, 368 F.3d at 1066 ("In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff 'must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right.'" (alterations in original) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir.1995))); *Singh v. McLaughlin*, 297 P.3d 514, 522 (Or. App. 2013) (elements of a malicious prosecution claim include: "(1) the institution or continuation of criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceeding; and (6) injury or damage because of the prosecution." (citation omitted)).

Here, a jury could infer malice from Defendants' arrest of Horstman without probable cause. "Evidence that a defendant initiated an arrest without probable cause is, standing alone, generally sufficient to give rise to an inference of malice." *Singh*, 297 P.3d at 523 (citation omitted); *accord Gustafson v. Payless Drug Stores Nw., Inc.*, 525 P.2d 118, 124 (Or. 1974) ("We consistently have held that the jury may make a finding of malice based upon lack of probable cause."). Additionally, evidence that Bonn knowingly provided Lesowski with misinformation about the description of the suspect from the pharmacy robberies, and about Horstman's statements during interrogation, would support a finding of malice. Consequently, Horstman has shown a genuine issue of material fact on malice.

## VIII. Oregon Tort Claims Act

Finally, the officer defendants argue that they are entitled to summary judgment on Horstman's state law claims for false arrest and malicious prosecution because, under Or. Rev.

Stat. § 30.265(1), the City is the only proper defendant on those claims.

In response, Horstman contends that Defendants' argument is based on a prior version of section 30.265(1).  Under the current version of the statute, Horstman argues he is entitled to maintain his claims against the City because he has pleaded damages above the statutory cap.

Section 30.265 provides, in pertinent part, as follows:

(1) Subject to the limitations of ORS 30.260 to 30.300, every public body is subject to civil action for its torts and those of its officers, employees and agents acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function or while operating a motor vehicle in a ridesharing arrangement authorized under ORS 276.598.

. . .

(3) If an action under ORS 30.260 to 30.300 alleges damages in an amount equal to or less than the damages allowed under ORS 30.271, 30.272 or 30.273, the sole cause of action for a tort committed by officers, employees or agents of a public body acting within the scope of their employment or duties and eligible for representation and indemnification under ORS 30.285 or 30.287 is an action against the public body. . . .

(4) If an action under ORS 30.260 to 30.300 alleges damages in an amount greater than the damages allowed under ORS 30.271, 30.272 or 30.273, the action may be brought and maintained against an officer, employee or agent of a public body, whether or not the public body is also named as a defendant. An action brought under this subsection is subject to the limitations on damages imposed under ORS 30.271, 30.272 or 30.273, and the total combined amount recovered in the action may not exceed those limitations for a single accident or occurrence without regard to the number or types of defendants named in the action.

Thus, Horstman's interpretation of the statute appears to be correct.  Defendants do not oppose Horstman's interpretation in their Reply.  Consequently, the OTCA does not entitle the officer defendants to summary judgment on Horstman's state law claims.

## CONCLUSION

For the reasons provided above, the parties' Cross-Motions for Summary Judgment should be granted in part and denied in part. Horstman's Motion for Partial Summary Judgment, ECF No. 46, should be granted to the extent it seeks judgment establishing the officer defendants' liability on his state and federal false arrest claims. The Motion should be denied in all other respects. Defendants' Motion for Summary Judgment, ECF No. 50, should be granted to the extent it seeks judgment in favor of the City on Horstman's federal claims for false arrest and malicious prosecution. The Motion should be denied in all other respects. Defendants' Motion to Strike should be denied as well.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to de novo consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately

FINDINGS AND RECOMMENDATION  - PAGE 37

appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1)

of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.


Dated this ___17th___ day of August, 2016.

Honorable Paul Papak
United States Magistrate Judge